**CONNECTICUT INDEMNITY COMPANY, Plaintiff,**

v.

**Mary L. STRINGFELLOW, Page E.T.C., Inc., t/d/b/a Page Transportation, Inc., Commerce & Industry Insurance, and Gerald Nash, Jr., Defendants.**

Civil Action No. 1:CV–96–442.

United States District Court, M.D. Pennsylvania.

Feb. 25, 1997.

George B. Faller, Jr., Carlisle, PA, W. Darren Powell, Martson, Deardorff, Williams & Otto, Carlisle, PA, for plaintiff.

James R. Ronca, Schmidt & Ronca, P.C., Harrisburg, PA, for Mary L. Stringfellow.

Timothy J. McMahon, Marshall, Dennehey, Warner, Coleman & Goggin, Harrisburg, PA, for Page, E.T.C. Inc. t/d/b/a Page Transportation, Inc., Commerce & Industry Insurance.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

Invoking our diversity jurisdiction, the plaintiff, Connecticut Indemnity Co., filed this action seeking a declaratory judgment under 28 U.S.C. § 2201 that defendant, Commerce & Industry Insurance Co., has to provide coverage for injuries defendant, Mary L. Stringfellow, suffered in an automobile accident with defendant, Gerald Nash, Jr.

At the time of the accident, Nash was driving his own tractor, which he routinely leased to defendant, Page E.T.C., Inc., t/d/b/a/ Page Transportation, Inc., and operated on its behalf. He was also pulling a trailer owned by Page. Commerce and Page have filed an answer alleging that Nash was not operating the tractor-trailer on Page's business at the time of the accident and that Commerce's policy provides no coverage.

Connecticut provided Nash with liability insurance except for injuries occurring, in part, while he was driving "in the business of anyone" to whom he had rented a covered auto. Commerce provided Page with liability insurance for anyone operating a tractor-trailer on its behalf or under a lease agreement with it.

We are considering cross-motions for summary judgment, one motion filed by plaintiff, the other by Commerce and Page. The question presented by Connecticut's motion is one of insurance law and principally requires us to decide whether at the time of the accident Nash was operating the tractor-trailer in Page's "business" or instead was pursuing personal matters.

The question presented by Page and Commerce's motion does not involve insurance law but whether Page can be held legally liable for Nash's conduct at the time of the accident under principles of respondeat superior in the context of a master-servant or employer-employee relationship. Page and Commerce assert that Page cannot be held liable and that, in turn, its insurer cannot be held responsible for coverage.

We will evaluate the cross-motions under the well established standard. *See Davis v. Portline Transportes Maritime Internacional,* 16 F.3d 532, 536 n. 3 (3d Cir.1994).

### II. *Background.*

At all times pertinent to this action, the following policy provisions were in effect. Connecticut provided Nash with commercial auto liability insurance for nontrucking use of his tractor, sometimes referred to simply as "bobtail" insurance.[1] The policy had the following exclusion, which was added by endorsement:

This insurance does not apply to:

a. A covered "auto" while used to carry property in any business.

b. A covered "auto" while in the business of anyone to whom the "auto" is rented.

(Plaintiff's motion for summary judgment, exhibit D). This endorsement also provided that:

WHO IS AN INSURED does not include anyone engaged in the business of transporting property by "auto" for hire who is liable for your conduct.

(*Id.*).

Commerce provided Page, through two endorsements to its policy, with liability insurance for anyone operating a tractor-trailer on its behalf or under a lease agreement with it. Specifically, the "Blanket Additional Insured Endorsement" read:

It is agreed that Additional insureds are covered under this policy as required by written contract, but only with respect to

---

1. In trucking parlance, bobtailing is driving a tractor without an attached trailer, *see Prestige Casualty Co. v. Michigan Mutual Insurance Co.,* 99 F.3d 1340, 1341 (6th Cir.1996), although as indicated above, Nash was actually "deadhead-ing," pulling an empty trailer. Nontrucking insurance covers both bobtail and deadhead operations. *Id. See also Wenkosky v. Protective Insurance Co.,* 698 F.Supp. 1227, 1228 (M.D.Pa.1988).

the operations performed by or for the named insured.

(Plaintiff's statement of material fact, no. 11)[2]

The "Named Insured" endorsement read, in pertinent part:

Page E.T.C.—Owner–Operators specifically designated parties as having entered into a contractual lease agreement with either Page E.T.C. Inc.... Page Transportation Inc to provide certain equipment as designated herein.

(Plaintiff's motion for summary judgment, exhibit C).

Nash and Page had the following business relationship. For some eight years before the accident, Nash had been a tractor-trailer driver for Page, operating as an independent contractor. Page had authority from the Interstate Commerce Commission (ICC) to operate an interstate trucking business. Nash did not.

On December 16, 1994, about a week before the accident, they entered into a 1–year agreement, captioned as "Motor Vehicle Agreement Between Independent Contractor and Carrier," but which is commonly called a lease in the industry. As part of the contract, Nash agreed to contract his tractor to Page Transportation, Inc., "for the purpose of loading and transporting freight," (defendants' exhibit C, ¶ A), and, as required by ICC regulation at 49 C.F.R. § 1957.12 (1995), Page had "exclusive possession, control and use of the equipment" and "complete responsibility for the operation thereof." (Plaintiff's statement of material facts, no. 7). Nash was obligated to maintain the tractor in operating condition, but the agreement did not require him to wash it. (Defendant's statement of material facts, nos. 28 and 29).

In the fall of 1994, Nash had the following routine. From his home in Liverpool, New York, he would call Ed VanHorn, Page's dispatcher in Weedsport, New York, for assignments. Among those assignments was a trip Nash had made since 1991, hauling calcium chloride from Oswego, New York, to Sprague Energy in Frederick, Maryland. His route for this trip from Liverpool to Frederick was I–81 south, then I–83 south, then route 15 south to Frederick.

After making delivery at Frederick, Nash would call VanHorn for instructions. Those instructions varied. Sometimes, he was told to return to Oswego and pick up a delivery there. Other times, he received no instructions, and he would just go home.

On the day of the accident, December 22, 1994, Nash picked up a trailer of calcium chloride from Oswego, took his normal route to Frederick, and emptied the trailer without incident. Because of federal regulations allowing him to drive only 10 hours in a 24–hour period, he intended to rest for 8 hours at the Manada Hill truck stop, which is on I–81, east of Harrisburg, Pennsylvania. At some point, either on the way down from Oswego or while the trailer was being unloaded at Frederick, he decided to have the tractor washed at a truck stop located on route 11 near Carlisle, Pennsylvania.

From 10:30 a.m. until 3:15 p.m., Nash stopped at a shopping plaza near Harrisburg or Mechanicsburg. At 3:15 p.m., he drove to the Carlisle truck stop (he believes he took route 114 to I–81 and then to route 11). The accident happened on route 11 very close to the truck stop. At the time, the Page logo and ICC placards were attached to the tractor, and Nash was logged on duty.

Nash had not yet called VanHorn, but had intended to do so before 5:00 p.m. He called VanHorn from the truck stop and told him about the accident. VanHorn told him to call another Page employee who was responsible for such matters, but did not give him any assignments, although he could have had one for him. In any event, Nash had not planned on working December 23, 24 or 25. He did plan to call VanHorn on December 23 but only to communicate with him.

While he was at the truck stop, Nash decided to look through a store there to get a Christmas present for his father. He may have thought about this on the way to the

2. We take the language of the blanket endorsement from the plaintiff's statement of material facts because blanket endorsement in the copy of the Commerce policy it supplied as exhibit C to its motion is illegible.

truck wash. In any event, he went to the Carlisle area to get the truck washed, not buy a Christmas present.

Nash had gone to the truck wash in the past when he made this run. He would not have taken route 114 to get to I–81 to head north and home, although this route might have been quicker than his normal route if he did not stop at the truck wash. Instead, he would have taken I–83 to I–81. Going to Carlisle took him 29.4 miles off his normal route, although if the number of miles he would have traveled on the normal route were subtracted from this total, the side trip would have added only about 13 miles to the total trip. (Plaintiff's motion, exhibit A).

### III. *Discussion.*

#### A. *Page and Commerce's Motion for Summary Judgment.*

■ Page argues that it cannot be liable for Nash's actions because he was not acting within the course and scope of his duties under the agreement, whether he is considered an independent contractor or an employee. It points out that it contracted with Nash "for loading and transporting freight," and Nash had completed that mission by the time of the accident, which took place when Nash decided to deviate from his route home to wash his tractor and purchase a Christmas present, matters of no importance to Page.

In making this argument, Page relies on Pennsylvania law discussing an employer's liability under the doctrine of respondeat superior for the torts of an employee. *See Kunkel v. Vogt,* 354 Pa. 279, 47 A.2d 195 (1946); *Johnson v. Glenn Sand & Gravel,* 308 Pa.Super. 22, 453 A.2d 1048 (1982); *Shuman Estate v. Weber,* 276 Pa.Super. 209, 419 A.2d 169 (1980); *Chamberlain v. Riddle,* 155 Pa.Super. 507, 38 A.2d 521 (1944).

We need not deal with this argument at length. Page is simply wrong in asserting that it can rely on state law of respondeat superior to defeat its potential liability for Nash's driving. To the contrary, it is well established that federal law controls this issue and that it imposes responsibility on Page for the actions of a driver of a leased tractor without regard to issues concerning course and scope of employment or whether the driver was performing his duties under the contract at the time of the accident.

*Mellon National Bank & Trust Co. v. Sophie Lines, Inc.,* 289 F.2d 473 (3d Cir.1961), dealt with this question. In *Mellon,* the Third Circuit held that the lessee of a tractor-trailer could be held liable for the driver's conduct even though at the time the tractor-trailer was hauling the goods of a third party. The court based this holding principally on the provision of the lease, mandated by the ICC, that the lessee maintain "exclusive possession, control and use" of the tractor-trailer and "full responsibility" with respect to it. *Id.* at 475, 477. The court also noted that the tractor-trailer was displaying the logo and ICC permits of the lessee. Significantly, it stressed that it did not matter that the lessee obtained some benefit from the third-party arrangement by avoiding a fee imposed under the lease when the driver has to transport an empty trailer. *See also Planet Insurance Co. v. Transport Indemnity Co.,* 823 F.2d 285, 288 (9th Cir.1987) (federal regulations of trip lease imposed liability on lessee for actions of driver and state law dealing with the course and scope of employment did not control, citing, among other cases, *Mellon*); *Price v. Westmoreland,* 727 F.2d 494 (5th Cir.1984) (common law principles of master-servant or respondeat superior do not apply to tractor-trailer lease governed by ICC, citing *Mellon*).

The reason for imposing such liability on the lessee is the protection of the general public. *Id.* at 477; *Prestige Casualty Co. v. Michigan Mutual Insurance Co.,* 99 F.3d 1340, 1342 (6th Cir.1996). The regulations attempt to insure a source of compensation for injured parties when a lease arrangement, common in the industry, might create confusion over who would be a responsible for accidents. *Id.*

We will therefore deny Page's motion for summary judgment, and because Commerce relies on Page's position, will deny its motion as well.

#### B. *Connecticut's Motion for Summary Judgment.*

Connecticut's motion argues that: (1) Page was Nash's statutory employer at the time of

the accident; (2) Commerce's policy provides coverage; and (3) Connecticut's policy excludes coverage. For Page's liability, the plaintiff relies on the ICC regulations and, among other cases, *Mellon, supra.* For Commerce's coverage, it relies on Commerce's policy language, quoted above, in which Commerce agreed to provide coverage for liability arising from vehicles leased by Page for its business. For lack of applicability of its own coverage, Connecticut relies on cases interpreting the two exclusions from its own policy which are quoted above.

Based on our foregoing discussion, Page is responsible for Nash's operation of the tractor-trailer at the time of the accident. Commerce's policy also appears to provide coverage and the defendants do not argue otherwise, having based their own motion for summary judgment in Commerce's favor on the erroneous position that Page was not responsible for Nash's conduct under common law principles. That leaves for resolution only the issue of whether Connecticut is correct in asserting that its policy excludes coverage for the accident.

To reiterate, the Connecticut policy had the following exclusions:

This insurance does not apply to:

a. A covered "auto" while used to carry property in any business.

b. A covered "auto" while in the business of anyone to whom the "auto" is rented.

(Plaintiff's motion for summary judgment, exhibit D).

■ Citing *Carriers Insurance Co. v. Griffie,* 357 F.Supp. 441 (W.D.Pa.1973), plaintiff argues that exclusion "a" bars coverage. In *Griffie,* before the lessor-driver was to pick up a load for delivery, he injured a third party while his vehicle was being inspected on the instructions of the lessee at a garage chosen by the lessee. The lessee's insurer sought indemnification for damages it paid to the third party from the lessor-driver's insurer, Hartford Accident & Indemnity Co. The latter provided insurance for nontrucking use, which contained the following exclusions, substantively similar to the exclusions at issue here:

It is agreed that such insurance as is afforded by the policy ... does not apply:

. . . . .

(b) while the automobile or any trailer attached thereto is used to carry property in any business;

(c) while the automobile is being used in the business of any person or organization to whom the automobile is rented.

357 F.Supp. at 442.

The court ruled that the lessee's insurer had no duty of coverage, finding that both exclusions (b) and (c) applied. As to exclusion (c), the court stated:

The carrier's inspection policy was obviously part of its business as a common carrier. The equipment was clearly being "used in the business" of the carrier at the time it ran over the victim's foot at the inspection station selected by the carrier. Clause (c) thus is operative to relieve Hartford from coverage under its policy.

*Id.* at 442 (footnote omitted).

As an alternative holding, the court also ruled that exclusion (b) applied, the counterpart to Connecticut's exclusion "a":

The mere fact that no cargo was being handled at the particular moment when the accident occurred does not mean that the equipment was not "used to carry property in any business." It was regularly so used to carry property in the carrier's business as a trucker. If the intent had been to extend coverage except when the equipment was actually hauling a load, it would not have been difficult to express such an intention clearly. In the absence of return loads, there is often much empty movement by common carriers, which they of course seek to minimize but never can entirely avoid. Likewise equipment often moves empty to a shipper's dock to pick up a load. In fact that was in substance what was being done here when the accident occurred. It can not successfully be contended that incidental empty movements are not part of a common carrier's busi-

ness of carrying property. Clause (b) relieves Hartford of liability on its policy. *Id.* at 442–43.

The plaintiff here similarly argues that exclusion "a" of its own policy should apply since, under *Griffie,* it is not necessary for Nash to have actually been hauling property at the time of the accident.

We respectfully disagree with *Griffie* and decline to follow it. Hartford's exclusion (c), like plaintiff's exclusion "a" specifically excludes coverage "while" the vehicle is being "used to carry property in any business." It follows that if the covered vehicle or vehicles are not being used to carry property, the exclusion does not apply and cannot be relied upon to deny coverage. In our view, the analysis in *Griffie* alters the meaning of the exclusion so that it would apply if the vehicle was regularly used to carry property in the lessee's business as a trucker, a significant alteration of the actual language.

■ We must therefore decide whether the accident comes within exclusion "b" of the Connecticut policy, the exclusion for an "auto," normally covered under the policy, but which is being used "while in the business of anyone to whom the 'auto' is rented."

Plaintiff contends that this exclusion applies by analogizing the wash Nash obtained for the tractor to the inspection the lessee required in *Griffie.* The plaintiff also relies on *Freed v. Travelers,* 300 F.2d 395 (7th Cir.1962), in which the Seventh Circuit held that the lessee's insurer had to provide coverage for a driver when he had an accident on the way to a repair shop, reasoning that the lessor-driver's trip to a repair shop to correct prior repairs on his tractor was part of the lessee's business when the lease required the driver to keep the tractor ready at all times for the use of the lessee.

We reject the plaintiff's analogy. Cleaning a tractor is qualitatively different from inspection or maintenance. The latter two activities have an important impact on the success of the lessee's business. *See Assicurazioni Generali v. Ranger Insurance Co.,* 64 F.3d 979, 983 (5th Cir.1995) (activities unilaterally undertaken by the lessor to repair brakes were arguably in the business of the lessee because they furthered the commercial interests of the lessee). Conversely, the appearance of the tractor, even over the 1-year period of the lease, would not necessarily matter to the lessee. The tractor would operate whether it was clean or not. We also add that the inspection in *Griffie* was on the instruction of the lessee.

The plaintiff next argues that Nash was on Page's business because he was on his way home hauling an empty Page trailer at the time of the accident after having transported a load for Page. The plaintiff maintains that the return trip was just as much a part of the journey as the actual delivery. In support, the plaintiff cites *Griffie, supra; Ropos v. Long Transportation Co.,* 147 F.Supp. 698 (W.D.Pa.1957); and *Connecticut Indemnity Co. v. Harris Transport Co.,* 909 F.Supp. 1212 (W.D.Ark.1995). The plaintiff also analogizes to Pennsylvania law on respondeat superior and worker's compensation to argue that Nash was in the course and scope of his contractual agreement with Page and hence was "in the business of" Page at the time of the accident.

*Griffie* and *Ropos* are clearly distinguishable. In *Griffie,* as noted above, the driver was under instruction from the lessee to have his equipment inspected. In *Ropos,* the driver was on route to pick up some cargo for delivery on the instruction of the lessee. Here, of course, Nash had completed his delivery and was under no instructions.

■ We also reject the plaintiff's position that, in interpreting its policy language, we should look to state-law tort cases dealing with respondeat superior liability or worker's compensation for an injured employee. This approach, while used in the cases the plaintiff cites, *see, e.g., Acceptance Insurance Co. v. Canter,* 927 F.2d 1026 (8th Cir.1991); *Liberty Mutual Insurance Co. v. Connecticut Indemnity Co.,* 857 F.Supp. 1300 (N.D.Ind.1994), *aff'd,* 55 F.3d 1333 (7th Cir.1995), as well as in *Hartford Insurance Co. v. Occidental Fire & Casualty Co.,* 908 F.2d 235 (7th Cir.1990), appears to be foreclosed by *Walter v. Dunlap,* 368 F.2d 118 (3d Cir.1966). In *Walter,* the Third Circuit refused to look to Pennsylvania cases dealing with the liability of the

lender of a servant to resolve the dispute in that case between the bobtail insurer and the lessee's insurer. Instead, the Third Circuit used a more flexible analysis. Moreover, the Pennsylvania worker's compensation cases start with a liberal approach toward granting relief to an injured employee, *see French v. Coff Decorators,* 199 Pa.Super. 482, 185 A.2d 646 (1962), and thus are more inclined to find that the worker was in the course and scope of his employment. *Compare French,* a worker's compensation case, *with Shuman Estate v. Weber,* 276 Pa.Super. 209, 419 A.2d 169 (1980), a respondeat superior case. It does not appear to be appropriate to use worker's compensation cases in the insurance context. We hasten to add, however, that insurance cases using these lines of authority are nevertheless helpful in resolving the issue in the instant action.

This would be a more difficult case if Nash had simply been heading home (regardless of what route he used) at the time of the accident without direction or an assignment from Page. Courts have reached conflicting results in those circumstances. *See Canter, supra* (the exclusion does not apply and there is bobtail coverage); *Engle v. Zurich–American Insurance Group,* 216 Mich.App. 482, 549 N.W.2d 589 (1996) (noting that reasonable persons could differ as to whether a driver on the way home after completing a delivery is acting in the business of the lessee and bobtail insurer had to provide coverage because of ambiguity).

On the other hand, a case the plaintiff cites, *Harris Transport, supra,* concluded on facts almost identical to the instant one that the exclusion did apply and the bobtail insurer was not obligated to provide coverage.

As in the instant case, when the accident happened, the driver was without any further instructions and was on his way home on the same route he had taken to make the interstate shipment. The court reasoned that the return trip was an integral part of the lessee's business because the equipment had to return from its destination to be of further use to the lessee. 909 F.Supp. at 1223.

However, Nash was not just returning home; he was driving to a truck washing facility and this fact clearly indicates that he was not acting in the business of Page at the time of the accident. He was instead tending to his own equipment for his own benefit. It is not important, as the plaintiff seems to think, to know how many miles he went out of his way. It is sufficient that at the time of the accident Nash was acting solely on his own behalf. That he was pulling a Page trailer is irrelevant since the side trip was made on his own behalf. *See Canter,* 927 F.2d at 1027–28 (implicitly rejecting the fact that the driver was pulling the lessee's empty trailer as a factor in determining that bobtail insurance applied).

As further support for our conclusion, the phrase "in the business of" is, at the very least, ambiguous and hence must be construed against plaintiff, the drafter of the language. *See Walter, supra,* 368 F.2d at 120 (buttressing its interpretation of the policy by noting that ambiguous provisions must be construed against the drafter). In *Reubush v. St. Paul Fire and Marine Insurance Co.,* 1987 WL 28345 (E.D.Pa.), the court also relied on this rule of law in holding that bobtail insurance applied. In *Reubush,* the driver had an accident while he was traveling to the lessee's terminal in the hope of being given an assignment, even though he had been told that there were no assignment available and there were four or five truckers ahead of him. The court decided that it was not clear whether the driver was acting in the business of the lessee or not. It therefore found that the bobtail insurer had to provide coverage despite its exclusion for accidents happening while the driver was "in the business of" the lessee.

The only remaining issue appears to be how to apportion coverage of the two policies. The only argument on this issue has been made by the plaintiff, who asserts that Commerce's policy is primary because plaintiff's policy provides no coverage. We have already decided that plaintiff's policy does provide coverage. We therefore reject this argument, and will not reach the issue of apportionment.

An appropriate order will issue.